IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> CRED INC., *et al.*, <br><br>       Debtors. | Chapter 11 <br> Case No. 20-12836 (JTD) <br> (Jointly Administered) <br> (Bankr. D. Del.) |
| CRED INC. LIQUIDATION TRUST, <br><br>       Appellant, <br><br>     v. <br><br> UPHOLD HQ INC., *et al.*, <br><br>       Appellees. | C.A. No. 23-461 (MN) <br><br> Adv. Proc. No. 22-50398 (JTD) <br> BAP No. 23-00020 |

## __MEMORANDUM OPINION__

Darren Azman, Andrew B. Kratenstein, Joseph B. Evans, Max J. Kellogg, MCDERMOTT WILL & EMERY LLP, New York, NY; David R. Hurst, MCDERMOTT WILL & EMERY LLP, Wilmington, DE – Attorneys for Appellant Cred Inc. Liquidation Trust.

Douglas W. Greene, Jorian L. Rose, Genevieve G. York-Erwin, Michael A. Sabella, Zachary R. Taylor, BAKER & HOSTETLER LLP, New York, NY; Jeffrey J. Lyons, BAKER & HOSTETLER LLP, Wilmington, DE – Attorneys for Appellees Uphold HQ Inc., *et al.*

March 27, 2024
Wilmington, Delaware



**NOREIKA, U.S. District Judge**

This appeal arises from the chapter 11 cases of Cred Inc. ("Cred") and certain affiliates (together "the Debtors") in an adversary proceeding initiated by the Cred Inc. Liquidation Trust ("the Trust") against defendants-appellees Uphold HQ Inc., Uphold Inc., and Uphold Ltd. (together, "Uphold"), in which the Trust seeks to hold Uphold liable in connection with the loss of hundreds of millions of dollars' worth of cryptocurrency invested in the Debtors' cryptocurrency lending platform.  Pending before the Court is the Trust's appeal of the Bankruptcy Court's April 13, 2023 Order (Adv. D.I. 37)[1] ("the Order") and accompanying Opinion, *In re Cred Inc.*, 650 B.R. 803 (Bankr. D. Del. 2023) ("the Opinion"), which granted Uphold's motion to dismiss (Adv. D.I. 5, 6) ("the Motion to Dismiss") the Trust's complaint (Adv. D.I. 3; A00004-A00574) ("the Complaint") for failure to state a claim and dismissed the Complaint in its entirety. The Trust has appealed the Bankruptcy Court's dismissal of Counts I and II, which alleged that Uphold aided and abetted Cred's officers' and directors' breaches of fiduciary duty.  The Trust also appeals the Bankruptcy Court's dismissal of the Complaint with prejudice.  For the reasons set forth below, the Court will affirm the Order.

## I.    BACKGROUND

### A.    Brief Factual Background

Uphold was founded in 2013 by its former CEO Juan Pablo Thieriot "(Thieriot"). (Complaint ¶ 18).  Uphold is a multi-asset cryptocurrency exchange, on which users can buy and sell cryptocurrencies, fiat currencies, equities, and precious metals.  (*Id*. ¶ 41).  Uphold provides

---

[1]    The docket of the adversary proceeding, captioned *Cred. Inc. Liquidating Trust v. Uphold HQ Inc*., Adv. No. 22-50398 (JTD) is cited herein as "Adv. D.I. __."  The docket of the chapter 11 cases, captioned *In re Cred Inc., et al*., No. 20-12836 (JTD), is cited herein as "B.D.I. __."  The appendix filed in support of the Trust's opening brief (D.I. 13-16) and the appendix filed in support of Uphold's answering brief (D.I. 22-25) are cited herein as "A__."

retail customers with a digital money platform ("the Uphold Platform") for transacting and storing cryptocurrency and markets itself as easy to use for new cryptocurrency investors. (*Id*. ¶ 42).

In February of 2018, Uphold engaged Daniel Schatt ("Schatt") to provide advisory services. (*Id*. ¶ 19). Shortly thereafter, in April of 2018, Schatt was appointed as a director on the board of Uphold, Ltd. (*Id*. ¶¶ 43-44). In May of 2018, Schatt, along with Lu Hua ("Hua") organized Cred. (*Id*. ¶ 19). Cred was a cryptocurrency yield-earning platform. Yield-earning platforms borrow cryptocurrency from their customers with a promise to pay them back at a later date with interest, essentially providing their customers unsecured notes. (*Id*. ¶ 39). The company seeks to earn a greater yield on the loaned cryptocurrency than it owes the customer, usually through re-lending or cryptocurrency trading strategies. (*Id*. ¶ 59). Yield-earning platforms are generally risky due to their promises of high returns (often in excess of 8-12%), the volatility of cryptocurrency prices, and a lack of a clearly applicable regulatory scheme. (*Id*. ¶¶ 40, 122).

Schatt and Hua were fifty percent (50%) co-owners of Cred. (*Id*. ¶ 54). At all relevant times, Schatt was Cred's CEO and a director on its board. (*Id*. ¶ 53). Hua was the second of Cred's two directors and was also the founder of a Chinese micro-lending platform called moKredit ("moKredit"). (Complaint at 6, n.10).

In June of 2018, Schatt introduced Thieriot to Hua, and the next month Uphold and Schatt began discussing a joint venture to create a yield earning program and eventually entered into a series of agreements to govern same. (*Id*. ¶ 57). There were two primary agreements between Uphold (specifically, Uphold HQ) and Cred concerning Uphold's making CredEarn accessible through the Uphold platform. The central agreement between the parties (which governed any subsequent scope of work agreements, or "SOWs") was the Master Services Agreement, dated July 13, 2018 ("the MSA"). (A00667-677); (A00628). The MSA granted each party certain rights

as against the other—including the right to terminate the MSA—and clearly delineated the contractual relationship between Uphold HQ and Cred:

> **Relationship of Parties**. The Parties acknowledge that this is a business relationship based on the express provisions of this Agreement and no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by this Agreement.

(A00674).  On or around January 16, 2019, Cred and Uphold entered into a Statement of Work ("the SOW #3") which governed the CredEarn offering specifically.  (Complaint ¶ 94 & Ex. O).  Pursuant to the SOW, Uphold would integrate CredEarn on its website and mobile application and, in exchange, Cred would pay Uphold a commission in the form of a service fee ("the Uphold Fees") for sending its customers to Cred.  (*Id*. ¶¶ 96-98 and Ex. O).  The Uphold Fees that Cred was required to pay under the SOW were in addition to the interest it owed to CredEarn customers and were paid to Uphold regardless of whether Cred made a profit from the loan.  (*Id*. ¶ 99).  The SOW provided that "all risk of loss of principal loan by [Cred] from [Uphold's customers] shall be borne by [Cred]." (*Id*. ¶ 120 and Ex. O).

On January 23, 2019, CredEarn launched.  All CredEarn's initial customers were driven to CredEarn by Uphold.  (*Id*. ¶ 138).  Since only a very small percentage of customers discovered the CredEarn website independently from Uphold, Cred and Uphold primarily targeted customers through jointly created advertisements disseminated by Uphold throughout the lifecycle of CredEarn, starting from its launch in early 2019 up until late 2020.  (*Id.* ¶¶ 102, 140-141, 206).  These marketing materials stated that Cred made loans to "reputable companies."  (*Id*. ¶¶ 216-220).  Other marketing materials falsely claimed that CredEarn was "safe," "secured," "insured," and "fully hedged."  (*Id*. ¶¶ 270-273).

In order to generate enough yield to satisfy the promised 8-12% return to CredEarn customers and Uphold's commission, Cred took "huge risks."  (*Id*. ¶ 158).  The vast majority

(90%) of the cryptocurrency Cred received from CredEarn customers was lent to moKredit, who would then loan the funds to its customers, who were primarily video gamers. (*Id*. ¶¶ 159, 168). Cred and moKredit's relationship was governed by a series of agreements, several of which were not executed until long after Cred had loaned moKredit tens of millions of dollars of customer cryptocurrency. (*Id*. ¶¶ 171-177). Although the moKredit Agreements (as defined in the Complaint at ¶ 174) granted Cred security interests in moKredit's accounts, inventory, equipment, instruments and securities, Cred never perfected them. (*Id*. ¶¶ 200-201). Additionally, when moKredit failed to repay principal on its loans as required by the moKredit Agreements, Cred would simply allow moKredit to roll the principal owed to the next tranche. (*Id*. ¶¶ 198-99).

Whereas Cred and moKredit only transacted with each other in fiat currency or "stable" cryptocurrency—cryptocurrency whose value is pegged to a stable asset such as the U.S. Dollar or gold ("Stablecoins")—Cred owed its customers Bitcoin ("BTC") and other cryptocurrencies. Thus, Cred bore the risk of loss if BTC or other cryptocurrencies increased in value during the life of the CredEarn loan. (*Id*. ¶ 185). In an effort to mitigate this risk, Cred hired an unlicensed and unregistered trading firm ("the Trading Firm") to enter into options, futures, and perpetual swaps for Cred in order to hedge against an increase in the price of cryptocurrency. (*Id*. ¶ 192). The Trading Firm enabled Cred to make risky trades that were otherwise unavailable to U.S. persons and entities. (*Id*. ¶¶ 23-24, 190). "Cred's highly leveraged trading strategy left Cred exposed to having its cryptocurrency positions depleted entirely" due to normal price fluctuations. (*Id*. ¶¶ 272-73).

Throughout 2019 and 2020, as Cred continued to take on debt, it suffered loss after loss in trading, hacks, and thefts—including by its Chief Capital Officer, James Alexander—which were ultimately more than it could recover from. (*Id*. ¶¶ 25, 367, 422-427).

4

**B.**   **Additional Well Pled Facts Accepted as True**

After addressing the required first step in considering a motion to dismiss—"separating the conclusions from well-pled facts" contained in the Complaint—the Bankruptcy Court's thorough Opinion sets forth the "facts taken from the Complaint" which "are accepted as true for the purposes of the Opinion." *In re Cred Inc*., 650 B.R. at 814.  Those facts include the joint venture discussions between Schatt, Thieriot, Hua; how customers participated in the CredEarn Program; CredEarn's launch; Cred's risky business plan, including its transactions with moKredit and the Trading Agent; and Cred's decline and the resulting losses. *See id*. at 814-20.  Relevant to this appeal, there does not appear to be any dispute as to the well pled facts, only what inferences may be drawn from them.  As the Court writes primarily for the parties, those facts are not repeated here.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Opinion.

**C.**   **Procedural Background**

The Debtors filed these chapter 11 cases on November 7, 2020.  On December 23, 2020, the Bankruptcy Court appointed an Examiner to "investigate allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of [Cred] of or by current or former management of the debtors, and otherwise perform the duties of an examiner, as set forth in Bankruptcy Code." (A890).  The Report concluded that Cred's demise was the result of internal mismanagement:

> The specific causative event was a "flash crash" in cryptocurrency trading value in March 2020 . . . The Examiner believes, however, that the firm's failure is more aptly attributed to dereliction in corporate responsibility.  Swings in crypto currency trading value were, after all, a foreseen aspect of the firm's business model.  But, Cred's corporate managers did not run the business to effectively counterbalance such risk, as was promised to customers.  This dereliction was grave.  Noticeable failures include, among other things: (1) un-systemic, chaotic, and, in some instances, non-

> existent diligence, accounting, and compliance functions;
> (ii) allowance for currency migration to non-Cred entities operating
> in mainland China (moKredit), without legal or practical capacity to
> repatriate capital as and when requested/needed by Cred; and
> (iii) allocation of important managerial and operating functions to
> an individual with an extremely worrisome past. Cred, it seems,
> excelled at its marketing objectives; but, its failures in the most basic
> of business functions portended its eventual demise.

(A00892-893). On March 11, 2021, Cred confirmed its liquidating plan (B.D.I. 629-1) ("the Plan"), which approved a liquidation trust agreement (B.D.I. 579-1) ("the Trust Agreement") and created the Trust to liquidate the Debtors' assets for the benefit of creditors. (Plan §§ 1.84, 12.3(c)). The Debtors' assets were transferred to the Trust, including various causes of action. The Trust reviewed Cred's records and data to estimate total losses—including the liabilities and obligations resulting from Cred's collapse—and arrived at a total of approximately $783,946,276. (Complaint ¶¶ 461, 464).

On July 22, 2022, the Trust commenced the adversary proceeding underlying this Appeal. Among other things, the Complaint alleged that five Cred insiders breached their fiduciary duties to Cred—Schatt, Hua, Alexander, Joe Podulka, and Daniel Wheeler. (A00084). These insiders are not, however, named as defendants in the Complaint. (*See* A000812 (Judge Dorsey: "[W]hy doesn't the Complaint also bring claims against the ones who actually committed the fiduciary violations?")). The Trust had previously entered into settlement and cooperation agreements with the Cred insiders for their breaches of fiduciary duties. (*See* A00832). Counts I and II of the Complaint sought to hold Uphold liable for aiding and abetting those breaches of fiduciary duties. Uphold moved to dismiss the Complaint. (Adv. D.I. 5). On January 11, 2023, the Bankruptcy Court heard argument on the Motion to Dismiss. (Adv. D.I. 34; A00785-831). On April 13, 2023, the Bankruptcy Court issued its Order and accompanying Opinion dismissing all counts with prejudice.

On April 26, 2023, the Trust filed a notice of appeal.  (D.I. 1).  The appeal is fully briefed. (D.I. 11, 26, 28, 30, 31).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.   <u>JURISDICTION AND STANDARDS OF REVIEW</u>

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).  A bankruptcy court's dismissal of a claim as failing to state a cause of action is subject to *de novo* review.  *In re LMI Legacy Holdings, Inc.,* 625 B.R. 268, 278 (D. Del. 2020) (citing *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)). A bankruptcy court's order dismissing claims with prejudice and denying an opportunity to amend the complaint is reviewed for abuse of discretion.  *Id.* (citing *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993)).

## III.   <u>DISCUSSION</u>

The Bankruptcy Court dismissed with prejudice Counts I and II of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to the adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012, "for failure to state a claim upon which relief can be granted."  Pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 n.27 (3d Cir. 2010).

This plausibility standard requires more than a mere possibility that a defendant is liable to the plaintiff. *Iqbal*, 556 U.S. at 678. When a complaint pleads facts that are merely "consistent with a defendant's liability," it "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557. The facts alleged must nudge the plaintiff's claims "across the line from conceivable to plausible." *Id.* at 570. Although in a motion to dismiss all well-pleaded facts are accepted as true, the trial court need not accept as true conclusory statements, statements of law, or unwarranted inferences cast as factual allegations. *See Twombly*, 550 U.S. at 555-57.

### A.    Dismissal of Count I – Aiding and Abetting Breach of the Fiduciary Duty of Care

The Trust argues that the Bankruptcy Court erred in dismissing Count I of the Complaint, which asserts that Uphold aided and abetted Cred's directors' and officers' breaches of their fiduciary duty of care. (*See* D.I. 11 at 21-45). The Trust argues that, rather than construing the Complaint's allegations as a whole and resolving inferences in favor of the Trust—as required on a motion to dismiss—the Bankruptcy Court improperly weighed factual evidence. (*Id.* at 19). As to the determination that the Trust's allegations were insufficient to give rise to a reasonable inference that Uphold knowingly participated in the breaches of the fiduciary duty of care, the Trust argues that the Bankruptcy Court ignored or downplayed dozens of well-supported factual allegations that, when taken individually or collectively, create a plausible inference that Uphold knew and understood the risks associated with CredEarn and, in aid of Cred's directors and officers

breaches of their fiduciary duties, misrepresented those risks to the detriment not only of Uphold's customers, but to Cred.  (*Id.*).

To state a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must plead "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."  *In re PMTS Liquidating Corp.*, 526 B.R. 536, 546 (D. Del. 2014) (citing *Shamrock Holdings v. Arenson*, 456 F.Supp.2d 599, 610 (D. Del. 2006)); *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  "As with standard fiduciary duty claims, any general allegations are subject to the general pleading requirements of Rule 8(a) while any fraudulent allegations are subject to the heightened pleading requirements of Rule 9([b])."  *In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301, at *15-16, (Bankr. D. Del. June 6, 2018).[2]

### 1.    <u>Pleading Standard for "Knowing Participation"</u>

To establish knowing participation, "one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."  *Bd. of Trs. of Teamsters v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002) (citation omitted).  Knowing participation involves two concepts: knowledge and participation.  *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 175 (Del. Ch. 2023).  To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."  *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (internal quotation marks omitted); *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2019).  "[A]ctual knowledge

---

[2]     The Trust disputed the applicability of Rule 9(b) to these claims.  The Bankruptcy Court had no need to resolve this issue, as the claims failed under the more lenient Rule 8(a) pleading standard.  As this Court ultimately agrees that dismissal is appropriate under Rule 8(a), it need not address this issue either.

requires that the alleged aider and abettor act 'knowingly, intentionally, or with reckless indifference . . . that is, with an illicit state of mind.'" *In re DSI Renal Holdings, LLC*, 2020 WL 7054390, at *6 (Bankr. D. Del. Dec. 2, 2020) (quoting *RBC Capital*, 129 A.3d at 862). "[C]onstructive knowledge may be found 'only if a fiduciary breaches its duty in an inherently wrongful manner' by engaging in conduct 'so egregious' so as to put a third party on notice of a breach." *Id.* (quoting *In re NewStarcom Holdings, Inc.*, 547 B.R. at 124). Whether a defendant acted with actual or constructive knowledge is a question of fact. *See RBC Cap. Markets, LLC*, 129 A.3d at 862.

To satisfy the requirement of participation, it is sufficient to allege that the third party "participated in the [fiduciary] decisions, conspired with [the fiduciary], or otherwise caused the [fiduciary] to make the decisions at issue." *Malpiede*, 780 A.2d at 1098. A third party can participate in a fiduciary breach by facilitating or inducing a breach of the duty of care. *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *48 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019). Consistent with these principles, the Restatement (Second) of Torts explains that a defendant can be secondarily liable for "harm resulting . . . from the tortious conduct of another" if the defendant:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). A comment on clause (b) states: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is

10

himself a tortfeasor and is responsible for the consequences of the other's act." *Id.* cmt. d.  Under the Restatement, giving "substantial assistance or encouragement" to the fiduciary in breaching its duty is sufficient to satisfy the participation requirement.

### 2.    The Factual Allegations Do Not Support a Reasonable Inference of Knowledge

The Bankruptcy Court concluded that the Trust did not sufficiently plead Uphold's knowing participation in any director's or officer's breach of the duty of care, as the Complaint was "devoid of allegations that show both: 1) Uphold knew of the problems at Cred; and 2) knowledge of the problems would have necessarily led Uphold to conclude that the Cred executives were breaching their fiduciary duties."  *In re Cred Inc.*, 650 B.R. at 823.   The Bankruptcy Court summarized the allegations of the Complaint relating to knowing participation as, at most, involving "[t]he presence of suspicious circumstances" and found that this "alone is not enough."  *Id.*   The Trust's primary issue on appeal is that the Bankruptcy Court failed "to assess the Complaint's allegations *in their entirety*," and instead "broke [them] down . . . into five separate buckets, and separately addressed each one in isolation."  (D.I. 11 at 26).  Failing to consider the allegations in their entirety, the Trust asserts, the Bankruptcy Court failed to draw the "reasonable inference" that Uphold knew Cred executives were breaching their fiduciary duties, including by (with Uphold's substantial assistance) falsely touting CredEarn as "safe," "insured," and "secure."  (*Id.*).

The Opinion reflects, however, that the Bankruptcy Court separated the factual allegations from conclusory ones and analyzed whether the factual allegations raised a reasonable inference that Uphold knew of the underlying breaches of the duty of care, and that its actions would assist those breaches.  That the Bankruptcy Court categorized the Complaint's factual allegations for explanatory purposes does not established that it analyzed them in isolation.  The allegations the

Trust cites in its appeal, considered together in their entirety, fall short of "nudg[ing] the plaintiff's claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### a.   **The Uphold-Cred Business Arrangement**

The Bankruptcy Court found that "while the Complaint alleges that Uphold knew generalities about Cred's risky business model . . . it does not include allegations that show Uphold knew the details that might have alerted it that Cred's relationship with MoKredit was a problem." *In re Cred Inc*., 650 B.R. at 824.  The Trust challenges this determination on appeal, arguing that the Complaint alleges far more than just "generalities," and its allegations detail how:

> Uphold planned to launch under its own name, and how Uphold developed the yield-earning program with Cred.  (A00015 ¶¶ 58-61.)  The Complaint explains that, in CredEarn's planning stages, Uphold's senior executives met with Hua and the MoKredit team "multiple times" which provided the basis for Uphold to understand the yield-earning model applicable to the CredEarn (and previously UpholdEarn) program.  (A00037 ¶ 210.)  The Complaint also cites testimony and other evidence demonstrating that Uphold fully understood Cred's business model, including MoKredit's role in that model.

(D.I. 11 at 27 (citing A00038-39 ¶¶ 211-212 (Schatt's testimony confirming that JP Thieriot and others at Uphold "were fully aware" of Cred's business model, including that, in connection with the CredEarn program, Cred would be relending its loans to moKredit, and that moKredit was then relending to videogamers))).  The Complaint also alleges that "despite co-developing the program and planning to launch and market it under its own name, Uphold and Cred insiders decided to shift all of the risks of the yield-earning program to Cred" and that, in so doing, "Uphold sought to reap the benefits of consistent transaction fees, building its crypto wallet-holder base, and attracting new customers."  (*Id*. at 28-29).  The Bankruptcy Court failed to recognize that "[s]uch an advantageous position is a basis to infer knowing participation," the Trust asserts.  (*Id*. at 29 (citing *In re: IH 1, Inc. Miller v. Kirkland & Ellis LLP*, 2016 WL 6394296, at *28 (Bankr. D. Del.

Sept. 28, 2016) ("The Court may infer such knowledge where the alleged aider and abetter gained an advantage from the [fiduciaries'] breach of its duties.")).

These allegations, separated from conclusory statements, raise a reasonable inference that: (1) Uphold initially planned to launch the yield earning program, but ultimately Cred launched it; (2) Uphold executives met with Hua "multiple times" and understood that moKredit lent primarily to Chinese video gamers; (3) SOW #3 allocated the risk of loss of customer funds to Cred; and (4) Uphold hoped that offering CredEarn on the Uphold platform would attract new customers to Uphold. (*See* D.I. 11 at 26-30). The most that can reasonably be inferred from these facts is that Uphold and Cred negotiated a business deal. The allegations provide no factual basis to infer that Uphold "fully" knew about all of the particular risks attendant to Cred's business (beyond the well-known fact that cryptocurrency prices fluctuate), and as the Bankruptcy Court correctly found, knowledge that a business deal is risky does not "equate to knowledge of a breach of fiduciary duty." *In re Cred Inc.,* B.R. 650 at 824. Assuming Uphold's knowledge of Cred's risky business model, it cannot be inferred from such an allegation that Uphold also knew that such a business model, as the Trust asserts, "forced Cred to take on additional debt in a fiscally irresponsible manner and by misusing corporate assets." (D.I. 11 at 30). As for the allocation of risk, given that Cred had sole discretion over how it lent out customer funds and sole responsibility to return customer funds, it is unremarkable that Cred also bore the risk of loss of funds under SOW #3.

**b.    <u>Knowledge of Cred's Dire Financial Situation</u>**

The Trust argues that the Complaint asserts not merely Uphold's knowledge of Cred's risky business model, but additionally Uphold's knowledge of Cred's dire financial situation, based on this portion of Schatt's deposition testimony, as cited in the Complaint:

> Q:  Did you ever tell Uphold about any hedging losses that Cred experienced?

A:  I believe I did.

(A00074; A00548).  The complaint alleges that Schatt also informed Uphold about moKredit's failure to pay under the parties loan and security agreement (Complaint ¶¶ 171-177) as well as Alexander's theft and the resulting lawsuit.  (A00073 ¶ 415, A00075 ¶ 424; A00078 ¶ 444, A00546-A00550).  Taken together, the Trust asserts, these allegations support a reasonable inference that Uphold knew that the offers and directors were breaching their duty of care through the "systematic failure of management to act within the bounds of reason in running the company." (D.I. 11 at 34 (citing A00851)).  The Bankruptcy Court inappropriately disregarded Schatt's testimony, the Trust argues, finding it alleged "only that Uphold was told something regarding Cred experiencing trading losses and an executive's theft."  *In re Cred Inc.*, 650 B.R. at 824.  The Bankruptcy Court further failed to resolve competing factual inferences in the Trust's favor, the Trust asserts, based on its conclusion that: "[i]t is just as reasonable to conclude from these allegations that Schatt told Uphold that the hedging losses and theft were not cause for concern as it is to conclude that he told Uphold that Cred was on the precipice of bankruptcy."  (*Id.*).

The Court finds no support for the Trust's argument that the Bankruptcy Court failed to consider Schatt's somewhat vague testimony, and the quoted excerpt from the Opinion does not demonstrate that the Bankruptcy Court improperly weighed "competing factual inferences," as the Trust asserts; rather, it indicates that nothing can be reasonably inferred from Schatt's statements with respect to Uphold's knowledge or culpable mindset: in other words, assuming the truth of Schatt's deposition testimony, the Bankruptcy Court could not reasonably infer Uphold's knowledge of a fiduciary duty breach based on its knowledge of Cred's hedging losses or an insider's theft.

14

c.      **Constructive Knowledge of Certain Uphold Executives**

The Trust asserts that, at the very least, Uphold had constructive knowledge of the fiduciary breaches, demonstrated by multiple Uphold executives and officers communicating their concerns about Cred's business model and mismanagement.  For example:

> "[U]pon receipt of a CredEarn marketing email claiming that Cred was offering up to a 9% interest return through CredEarn, Uphold CFO Lee Hansen ("Hansen") forwarded the email to Thieriot and Uphold's Chief Revenue Officer Robin O'Connell ("O'Connell") asking "How can they do this?" In response, O'Connell responded 'Magic?'"
>
> Former Uphold Board member Steckel stated about an investor: **"As with me, he will be curious and doubtful as to the risk [t]aken by [C]red to guarantee such a return . . . ."**
>
> Steckel further stated: **"The lack of visibility around the way Cred deploys its money and recourse is a conversation that [Thieriot] and I have engaged in before.** As the amount of money that has been sent to Cred has increased significantly, their procedures and the protections afforded to our customers should be reviewed. A failure on their part would not just be a problem for our customer but also almost automatically result in lawsuits against Uphold."

(Complaint ¶¶ 296, 297, 300 & Exs. MM, NN).  According to the Trust, the Bankruptcy Court impermissibly drew inferences in Uphold's favor, determining in that the allegations "demonstrate that there were red flags[,] [b]ut that is not enough to establish the required knowledge to state a claim for aiding and abetting breach of fiduciary duty."  *In re Cred Inc.*, 650 B.R. at 827.  Citing several cases in support, the Trust argues that Delaware law is clear that knowing participation may be found on constructive knowledge, where the fiduciaries' conduct is "so egregious" so as to put a third party on notice of a breach.  (D.I. 11 at 36).  According to the Trust, these communications reflect that, "in addition to Schatt, at least Thieriot, Hansen, O'Connell, and Steckel knew and/or were put on notice of the various Cred executives' breaches."  (*Id.*).

The Trust is correct that a fiduciary's conduct may be so egregious as to put a third party on notice of a breach. *See e.g., In re USA Cafes, L.P. Litig.*, 600 A.2d 43, 56 (Del. Ch. 1991) (knowledge of breach inferred from participation in transaction where nearly 25% of purchase price was paid directly to target's directors and officers); *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021) (knowledge of breach inferred where defendant shared unauthorized information with third party to manipulate sale process, misled the board, and entered into last minute agreement to increase its own success fee); *Park Lawn Corp. v. PlotBox Inc.*, 2021 WL 5038751, at *3 (D. Del. Oct. 29, 2021) (denying dismissal of aiding and abetting claim against competitor defendant alleged to have assisted plaintiff's CEO in CEO's attempt to poach plaintiff's technology expert, finding defendant knew it was dealing with competitor's CEO and therefore had constructive knowledge of CEO's fiduciary duties). Knowledge of egregious conduct, however, cannot be inferred by Uphold's communications. Rather, the emails merely reflect that three individuals within Uphold questioned how Cred could deliver a 9-10% interest return to CredEarn customers; they do not raise an inference of fiduciary conduct so egregious as to put them on notice of a breach. The communications further undermine the inference, urged by the Trust, that Uphold "fully knew" all aspects of Cred's business and reflect instead that Uphold had limited visibility into CredEarn's operations and management. (*See* D.I. 11 at 35 (noting Steckel's "curiosity" and "lack of visibility around the way Cred deploys its money")).

The Court agrees that the most that can be inferred from these emails is that certain employees at certain times had doubts, while other Trust exhibits support an inference that Cred was in fact delivering the advertised interest return to CredEarn customers for some time. (*See, e.g.,* A00409 (internal Uphold email noting that as late as 5/4/20, Cred had been "paying the

interest" on CredEarn loans); A00358 (5/14/20 email from D. Wheeler stating that Cred did not have "any retail CredEarn defaults" and that "Cred has gone through three severe crypto market corrections and has met all of its redemption/interest commitments").  Giving the Trust the benefit of every reasonable inference, the Bankruptcy Court concluded that these allegations "[a]t best, [] demonstrate that there were red flags," but were not enough to establish knowledge of the alleged breaches.  *In re Cred Inc.*, 650 B.R. at 827.

### d.   False Marketing Materials

The Trust disputes the Bankruptcy Court's determination that, "while the Complaint alleges that Uphold knew [the marketing materials] were false, it includes no facts to support that conclusion."  *Id.* at 824.  The Court agrees, however, that the allegations cited by the Trust largely repeat its prior assertions: because Uphold (i) knew about Cred's business model, (ii) knew that Cred had a hedging strategy, (iii) was informed by Schatt about "hedging losses" at some point in time, (iv) had a few individuals question how Cred could pay its advertised interest rate, and (v) was aware that insurance was important to customers—Uphold therefore must have known that CredEarn was not lending to "reputable companies," and was not "secured," "guaranteed," "insured," or "fully hedged," rendering its marketing materials false.  As the Bankruptcy Court correctly observed—and the Trust does not dispute on appeal—all of the exhibits the Trust relies upon in arguing that the marketing materials were false were internal Cred emails not shared with anyone at Uphold.  *In re Cred Inc.*, 650 B.R. at 825 ("[W]hile the Trust cites to internal Cred emails discussing the fact that the marketing materials should not include references to insurance . . . there is nothing in the Complaint that demonstrates anyone at Uphold was informed about Cred's lack of insurance coverage."); (A00607-610).  The only exhibit bearing upon Uphold's knowledge of the veracity of CredEarn's marketing materials is an exhibit demonstrating that Uphold's CEO actually believed CredEarn was fully hedged and secure.  (A00049).  The Court

agrees it would be unreasonable to infer, based on the above allegations, that Uphold knew Cred marketing materials were false.

<strong>e.      Imputing Schatt's Knowledge of Cred's Mismanagement to Uphold</strong>

The Trust challenges the Bankruptcy Court's determination that Schatt's knowledge cannot be imputed to Uphold. (*See* D.I. 11 at 39-41). "The general rule is that a director's knowledge is imputed to the corporation because directors have the authority and ability to act on behalf of the corporation." *In re AMC Invs., LLC*, 637 B.R. 43, 59 (Bankr. D. Del. 2022). Here, Schatt's knowledge should be imputed to Uphold, the Trust argues, because Schatt used the same knowledge while acting for both Uphold and Cred. *See NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014) (finding an imputation of knowledge where an officer "could not segregate the information he learned while acting on behalf of Related Sub[sidiary] and that he necessarily used that information when acting for Related Parent"). In rejecting this imputation, the Trust argues, the Bankruptcy Court ruled on issues of fact not resolvable on a motion to dismiss and made improper inferences in favor of Uphold. *See, e.g., In re Maxus Energy Corp.*, 641 B.R. 467, 513 (Bankr. D. Del. 2022) ("the issue of whether to impute the Defendants' knowledge or intent to Maxus is one of fact").

But as Uphold correctly points out, the only factual allegation the Trust relies on in support of imputation is the fact that Schatt was a director at both Cred and Uphold Ltd. "The fact that two or more corporations have officers or agents in common will not of itself impute the knowledge gained by such officers [or agents] while acting for one corporation to another corporation in which they also hold office." *NAMA Holdings,* 2014 WL 6436647, at *27; A00776 n.8). The bare assertion of Schatt's dual roles is insufficient as a matter of law to impute Schatt's knowledge of Cred's internal mismanagement to Uphold. More importantly, Schatt was a director

18

of Uphold, Ltd., not Uphold HQ—the entity that executed SOW #3 with Cred and was solely responsible for the CredEarn offering on the Uphold platform.  There are no allegations to support a reasonable inference that Uphold Ltd. was involved with overseeing or implementing the CredEarn offering.  CredEarn is never mentioned in any of the Uphold Ltd. Board minutes attached to the Complaint.  (A00519-533).  Ultimately, there was no issue of fact to resolve here,[3] and no reason to impute Schatt's knowledge of Cred's internal mismanagement to Uphold Ltd., or any other Uphold entity.  The Court must agree with the Bankruptcy Court's conclusion that "[t]here is nothing in the Complaint . . . that would support the conclusion that Uphold, Ltd. was involved with the CredEarn program at all," such that "imputing Schatt's knowledge to Uphold, Ltd. does nothing to assist the Trust in establishing that Uphold HQ, Inc. had the knowledge necessary to support the Trust's claim."  *In re Cred Inc.*, 650 B.R. at 826.

The fact that the Bankruptcy Court organized the factual allegations into "five buckets" for purposes of its analysis is of no moment.  In sum, considering the Complaint in its entirety, the Bankruptcy Court correctly determined that the factual allegations did not give rise to a reasonable inference that Uphold knew about Cred insiders' mismanagement of Cred, or that by offering

---

[3]     The Trust asserts that Schatt was a director of each Uphold entity.  (D.I. 11 at 40 n.12).  The only facts the Trust has furnished concerning Schatt's role as a director are the Uphold Ltd. board minutes.  (A00519-533).  As the Bankruptcy Court noted, "Although the Complaint states only that Schatt 'served on Uphold's Board of Directors' (where 'Uphold' is defined as including all three of the defendants), the board meeting minutes attached to the Complaint show that Schatt was a director of Uphold, Ltd.".  *In re Cred Inc.*, 650 B.R. at 826.  In its reply brief, the Trust argued for the first time that a joint brief filed by Uphold and Dan Schatt Cred's former CEO in an unrelated state court case several years ago shows that Schatt was in fact a director of Uphold HQ.  In post briefing letters, the parties disputed whether this Court should take judicial notice of the document and whether it should consider the argument.  (*See* D.I. 30, 31).  As it was not presented to the Bankruptcy Court or referenced in the opening brief, it will not be considered here.

CredEarn on the Uphold platform, Uphold would be assisting in that mismanagement—both of which the Trust is required to adequately plead.

### 3. The Factual Allegations Do Not Support a Reasonable Inference of Substantial Assistance

#### a. Designing, Controlling, and Facilitating CredEarn

As the Trust correctly asserts, a third party can participate in a fiduciary breach by facilitating or inducing a breach of the duty of care. *See In re PLX Tech.*, 2018 WL 5018535, at *48; *see also In re OODC, LLC*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (finding that a trustee adequately alleged aiding and abetting because defendants were "aware of these activities and participated in them by extending loans to the Debtor to facilitate the actions of Carter and Large"). Here, the Trust argues, Cred executives breached their fiduciary duties not only "from a systemic failure of management to act within the bounds of reason in running the company" but also because Cred's entire business model forced Cred to take on "additional debt in a fiscally irresponsible manner" and by misusing corporate assets. And, according to the Trust, Uphold's co-design of and control over CredEarn, together with Uphold's marketing, were services that facilitated the breaches. (D.I. 11 at 41-42).

The Complaint alleges that: Uphold co-designed the CredEarn program with Schatt (Complaint ¶¶ 58-63, 79-80, 87, 136-40); Cred was "100% dependent on Uphold" to launch and be successful (*id.* ¶ 313), thus Uphold was able to exercise control over Cred; that Uphold also controlled Cred and the CredEarn program by the terms of the SOW, which provided that Cred bore all the risk and that Cred would not change its requirements under the CredEarn Offering without Uphold's prior written consent (*id.* ¶ 105); and that Uphold comingled Cred's and CredEarn customers' cryptocurrency, resulting in its functional and financial control over Cred. (*id.* ¶¶ 113, 116). The Trust argues that the Bankruptcy Court failed to consider these allegations

in their entirety and further cites case law supporting the proposition that allegations of control such as those contained in the Complaint have been held to create a plausible inference of knowing participation. *See In re Advance Nanotech, Inc*., 2014 WL 1320145, at *7 (Bankr. D. Del. Apr. 2, 2014).

The Bankruptcy Court determined that, "[E]ven if the Trust could establish that Uphold exerted contractual and function[al] control over Cred, it fails to explain how such control would have 'assisted' the purported breaches of fiduciary duty." *In re Cred Inc*., 650 B.R. at 829. The Court agrees. Taking all of these allegations as true, they are merely of the sort "consistent with a defendant's liability," which "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557. There are no facts to support a reasonable inference that Cred was "100% dependent on Uphold," only an email from March 15, 2019 (less than two months after CredEarn's launch) wherein Schatt stated that Cred was "100% dependent on Uphold for our revenue *at this time*." (A00410; A00778) (emphasis added). As Uphold points out, that says nothing about CredEarn's dependency (or lack thereof) at any later time, and various exhibits demonstrate that Cred later offered CredEarn on at least eleven other platforms beyond Uphold's. The governing agreements, including SOW #3, establish that Cred retained control over CredEarn subject to modest restrictions that required mutual assent, and the MSA granted Cred the right to terminate SOW #3.

The allegations do not support a reasonable inference that Uphold controlled CredEarn, much less in any way that would have assisted Cred insiders in mismanaging Cred.

### b.   Disseminating False Marketing Materials

The factual allegations do not support a reasonable inference that Uphold substantially assisted in Cred insiders' breaches of care by disseminating false marketing materials either. According to the Trust, the Complaint attaches myriad examples of Uphold's marketing of

CredEarn.  (¶¶ 206, 215-16, 220, 228-30, 247-50; A00289-326; A00332-36; A00341-51; A00370-76).  The Trust further asserts that any factual questions regarding how much Uphold marketed CredEarn and whether that activity amounts to substantial assistance are not appropriately resolved on a motion to dismiss.  The Court agrees with the Trust.  Here, however, no facts are pleaded to support an inference that Uphold knew any such marketing materials were false, defeating the "knowing participation" element.  Rather the operative agreements demonstrate that Cred retained primary control over marketing CredEarn under SOW #3 and that Uphold allowed Cred to market CredEarn on Uphold's platform.  (*See* A00366 (Cred marketing guidelines requiring Cred approval of CredEarn marketing materials published by Uphold); A00430 (11/28/19 email from L. Westerfield (Uphold): "[O]ur role is to provide distribution for content; Cred and others provide content")).  Considering the Complaint in its entirety, the Bankruptcy Court correctly determined that the factual allegations did not give rise to a reasonable inference that Uphold substantially assisted in any breach of the duty of care.

**B.    Dismissal of Count II—Aiding and Abetting Breach of the Fiduciary Duties of Loyalty and Good Faith**

The Trust argues that the Bankruptcy Court erred in dismissing Count II of the Complaint, which asserted that that Uphold aided and abetted the Cred officers' and directors' breaches of fiduciary duty of loyalty and good faith.  The Bankruptcy Court erroneously found no breach of loyalty by Schatt and Hua, the Trust argues, despite those individuals being on both sides of the negotiating table on transactions and arrangements that were vastly unfair and detrimental to Cred.  (*See* D.I. 11 at 49-54).

The Trust asserts three underlying breaches of Schatt's and Hua's duties of loyalty and good faith: (i) creation and dissemination of the same false marketing discussed in connection with Count I; (ii) Schatt's entering into SOW #3, which allegedly benefitted Uphold to the detriment of

Cred; and (iii) Hua's entering into a business relationship between Cred and moKredit that disproportionately benefitted moKredit to the detriment of Cred. (*See id.*). The Bankruptcy Court properly rejected each of these theories.

With respect to the false marketing materials, the Bankruptcy Court found that even accepting the factual allegations as true, nothing "support[ed] the conclusion that Schatt or Hua acted intentionally in disregarding their duties." *In re Cred Inc.*, 650 B.R. at 831; *see also In re Old Bpsush Inc.*, 2021 WL 4453595, *12 (D. Del. Sept. 29, 2021) ("A very extreme set of facts is required to sustain a disloyalty claim premised on the notion that disinterested directors or officers were intentionally disregarding their duties.") (cleaned up). The Court agrees. The Complaint is devoid of any factual allegations supporting an inference that Schatt or Hua knew at any time before the market crash in March 2020 that CredEarn's hedging strategies were deficient or that CredEarn was otherwise inadequately insured or secured, or that they intentionally caused CredEarn to be so. The Trust exhibits show that as late as June 2020, Cred insiders believed they could return Cred to profitability by the end of the year. But even assuming that Complaint alleged facts supporting a reasonable inference that the creation and/or dissemination of Cred marketing materials constituted an underlying breach of loyalty or good faith, no facts suggest that Uphold knowingly participated in disseminating false marketing materials. And the Complaint contains no allegations indicating that Uphold had anything to do with any alleged failure by Schatt or Hua to properly hedge, secure, or insure CredEarn loans.

With respect to SOW #3, the Bankruptcy Court concluded that the mere fact that Schatt was a director at both Cred and Uphold Ltd. is not enough to support a reasonable inference of a self-interested transaction. "To establish a breach of the fiduciary duty of loyalty, plaintiffs must show that the [individual] either (1) stood on both sides of the transaction and dictated its terms in

a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally." *In re Coca-Cola Enters.*, 2007 Del. Ch. LEXIS 147, at *12 (Del. Ch. Oct. 17, 2007). The Trust objects on bases similar to those discussed above in connection with Count I—essentially that Uphold "controlled" Cred (and "exploited" Schatt) and forced Cred into a bad deal (D.I. 11 at 49-50). Those arguments fail here as well. The facts pleaded do not support a reasonable inference that this was anything other than an arms' length agreement. Schatt was a director at Uphold Ltd., not Uphold HQ (the entity that contracted with Cred in SOW #3), and thus was not on both sides of the transaction. There are no factual allegations that Schatt was involved in negotiating the SOW #3 or stood to gain any personal benefit for negotiating in Uphold's favor.

Finally, the Bankruptcy Court correctly concluded that the moKredit-Cred business relationship could not give rise to an aiding and abetting claim because there were no allegations indicating that Uphold had anything to do with the relationship between those third parties. *In re Cred Inc.*, 650 B.R. at 831 n.93 ("[G]iven that there are no allegations in the Complaint that suggest Uphold was in any way involved with Hua or MoKredit's relationship with Cred . . . it is reasonable to conclude that this allegation does not form the basis for the Trust's aiding and abetting claim").

## C.   Dismissal of the Complaint with Prejudice

"The Bankruptcy Court stated no reason for denying the Trust an opportunity to amend," the Trust argues, and its blanket refusal to grant leave to amend without any stated rationale was an "abuse of discretion." (D.I. 28 at 27-28). "The court should freely give leave [to amend] when justice so requires," the Trust asserts, and thus, should this Court construe any part of the Complaint as deficient, the Trust "should be permitted to amend." (D.I. 11 at 54 (quoting *In re Zohar III*, 631 B.R. 133, 172 (Bankr. D. Del. 2021)).

Here, the Bankruptcy Court dismissed the Complaint with prejudice—*i.e.*, without leave to amend—but did not cite a specific basis for denying leave to amend. The standard of review

for denial of leave to amend is "plenary if the denial is based on a legal error, and otherwise is for abuse of discretion." *In re KII Liquidating, Inc*., 607 B.R. 398, 404-05 (D. Del. 2019). "A court abuses its discretion only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." *In re LMI Legacy*, 625 B.R. at 291. A decision denying leave to amend "stands under that standard unless no reasonable person would adopt the lower court's view." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *5 (D. Del. Aug. 18, 2022).

The Supreme Court has instructed, that while "[t]he grant or denial of an opportunity to amend is within the discretion of the [ ] Court," an "outright refusal to grant the leave without any justifying reason . . . is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Third Circuit has instructed, "[i]t does not matter whether or not a plaintiff seeks leave to amend . . . if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

Uphold argues that the Bankruptcy Court's dismissal of Counts I and II with prejudice was proper as any amendment to the Complaint would be futile. (*See* D.I. 26 at 50-52). According to Uphold, "[t]he Trust brought this case after having conducted an extensive pre-litigation investigation, including depositions of key witnesses and receipt of over 100,000 pages voluntarily produced by Uphold (along with countless internal Cred documents, and documents from other third parties)." (*Id*. at 50-51). "Despite the luxury of that extensive pre-litigation discovery," Uphold argues, the Bankruptcy Court concluded that "the Complaint suffer[ed] from profound factual pleading deficiencies." (*Id*. at 51).

Although there is no separate section setting forth the Bankruptcy Court's reasoning for dismissing the Complaint with prejudice, the Opinion contains several "justifying reason[s]," *Forman,* 371 U.S. at 182, which indicate that amendment here would be "futile," *Phillips,* 515 F.3d at 236.  Indeed, prefacing its detailed analysis of the Complaint's factual allegations, which "achieve[d] a level of obscurity and incomprehensibility that is truly remarkable," together with its deficiencies, the Bankruptcy Court explained that:

> Here, both my experience and common sense lead me to conclude that the Trust does not state any claim for relief against Uphold that is plausible. Even assuming the truth of all the properly pled factual allegations, those that support the conclusion that Uphold acted unlawfully are sparse and the Trust assigns far greater significance to them than is reasonable. Put simply, the claims alleged are at best only possible, not plausible, and the sheer possibility of liability is not enough.

*In re Cred Inc.,* 650 B.R. at 814.  Moreover, the Trust has identified no new information or specific facts, or provided any proposed amendments, that would cure the Complaint's deficiencies.  *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir. 2002) (no abuse of discretion in denying leave to amend where plaintiffs made no representation concerning new information received since filing the complaint and provided no proposed amendments or specific facts that would cure the complaint's pleading deficiencies).  Based on the foregoing, the Bankruptcy Court was within its discretion in determining that Counts I and II for aiding and abetting breach of fiduciary duty would not be salvaged by further amendment and, therefore, should be dismissed with prejudice.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Order shall be affirmed.  A separate Order shall be entered.